

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-09-001-CR

ENNIS LEE DENSON                                                                 APPELLANT

V.

THE STATE OF TEXAS                                                                    STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant Ennis Lee Denson appeals his conviction for aggravated assault, contending in two respective points that the evidence is legally and factually insufficient to show that he used or exhibited a deadly weapon. *See* Tex. Penal Code Ann. §§ 22.01(a)(1), 22.02(a)(2) (Vernon Supp. 2009). We affirm.

---

[1]... *See* Tex. R. App. P. 47.4.

Background Facts

The State's version of the facts

In August 2008, Beckie Conyers drove with her sister-in-law to Carver Avenue in Fort Worth to see a friend, Larry Cooper, and to ask if he would pay her to clean his house.[2]  Cooper was not home, so Conyers tried to get back in the car when Denson approached her from the porch next to Cooper's house. Denson put crack rocks in Conyers's shirt pocket and said, "[N]ow give me your money, bitch."  Conyers said she did not want the drugs, and then Denson grabbed Conyers, threw a cup of water on her, and pushed her into the street.

Raymond Oliver, a pastor at a church on Carver Avenue, and Gerald Stiefer, who lived in the same neighborhood as the church, had just finished mowing the church's lawn.  As Oliver and Stiefer drove in Oliver's truck, they saw Conyers "flying" out of the bushes and landing on her back in the middle of the street.[3]  Oliver stopped his truck ten to fifteen yards away from Conyers, and they saw Denson come behind Conyers and start to kick and stomp her. Denson continued to tell Conyers to give him her money, and as he pulled out a foot-long butcher knife from his waist, it appeared to Oliver and Stiefer that

_____

[2] ... Conyers testified that she was aware that Cooper sells drugs but that she was not there to buy drugs.

[3] ... Oliver and Stiefer testified consistently at trial.

2

Denson tried to cut off Conyers's fingers as Conyers tried to defend herself and get Denson away from her.

Denson grabbed Conyers by her hair and moved the knife toward her throat; Oliver and Stiefer thought that Denson was going to cut her throat, so Oliver walked to the front of his truck and "hollered" at Denson. Denson asked Oliver, "[Y]ou want some[?]" Oliver replied, "Yes," and Denson then began to approach Oliver with the knife, but someone in the neighborhood said, "Hey, that's pastor," and Denson ran away with the knife. Conyers, who was heavily bleeding from a cut to her finger and was hysterical, jumped into Oliver's truck as he called the police. Conyers bled in several parts of Oliver's truck.[4]

Fort Worth Police Officer J.R. Cox received a dispatch call to Carver Avenue. When Officer Cox arrived, other officers were speaking with witnesses and had already taken Denson into custody. Denson had changed clothes in the fifteen to twenty minutes between his altercation with Conyers and his arrest. Officer Cox took Denson to jail.

Denson spoke with Fort Worth Police Detective Darren Darracq and initially denied taking part at all in the altercation with Conyers. However,

---

[4] The trial court admitted a picture of the inside of Oliver's truck that showed Conyers's blood on the door.

Denson later told Detective Darracq that he felt that he could take advantage of Conyers by getting her money without providing drugs.

Denson's version of the facts

Denson testified to the following facts. He knew and disapproved of the fact that Cooper (who lived in the house next to Denson's mother's house) sold drugs, and he thought that if he could "cause some kind of conflict, [he] might could get the task force or somebody to come through there and get this place." When he saw Conyers knocking on Cooper's door, he asked her what she was looking for, and she said that she was looking "for a 20." Denson gave Conyers some cut up potatoes that looked like crack rocks. Conyers said, "[T]his is not no 20," and she reached into the car and pulled out a butcher knife. Denson threw water in Conyers's face, grabbed the knife, and pushed her into the street. When Oliver arrived, Denson "panicked" and ran away. Officers arrested him when he tried to come back to the scene to tell his side of the story.

Procedural history

A Tarrant County grand jury indicted Denson with aggravated assault; the indictment included a habitual offender notice that alleged that Denson had

4

already been convicted of two other felonies.[5]  Denson waived his right to a jury trial and entered a plea of not guilty.  After the parties presented evidence and closing arguments, the trial court found Denson guilty and sentenced him to twenty-five years' confinement.  Denson filed his notice of this appeal.

## Evidentiary Sufficiency

To convict Denson of aggravated assault based on the allegations in the indictment, the State was required to prove that he intentionally, knowingly, or recklessly caused bodily injury to Conyers and that he used or exhibited a deadly weapon while doing so.  *See* Tex. Penal Code Ann. §§ 22.01(a)(1), 22.02(a)(2).  In his two related points, Denson argues that the evidence is legally and factually insufficient to prove that he used or exhibited a deadly weapon.

## Standards of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v.*

---

[5] ... Although aggravated assault is typically a second-degree felony, the habitual offender notice allowed the State to use the punishment range of a first-degree felony.  *See* Tex. Penal Code Ann. §§ 12.42(b), 22.02(b) (Vernon Supp. 2009).

*Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Steadman*, 280 S.W.3d at 246; *Watson*, 204 S.W.3d at 414–15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, although legally sufficient, contradicts the judgment. *Watson*, 204 S.W.3d at 417.

Unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the factfinder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000); *see Steadman*, 280 S.W.3d at 246. Evidence is always factually sufficient when it preponderates in favor of the conviction. *Steadman*, 280 S.W.3d at 247; *see Watson*, 204 S.W.3d at 417.

7

Applicable law and analysis

The sole question in this case is whether the foot-long butcher knife involved in the fight between Denson and Conyers qualifies as a deadly weapon. The penal code's definition of deadly weapon includes "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17)(B) (Vernon Supp. 2009); *Wingfield v. State*, 282 S.W.3d 102, 107 (Tex. App.—Fort Worth 2009, pet. ref'd); *Gordon v. State*, 173 S.W.3d 870, 873 (Tex. App.—Fort Worth 2005, no pet.). "Serious bodily injury" is an injury that "creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Tex. Penal Code Ann. § 1.07(a)(46). Losing the use of fingers may comprise a serious bodily injury. *See Allen v. State*, 736 S.W.2d 225, 226–27 (Tex. App.—Corpus Christi 1987, pet. ref'd). Threatening to cut someone's throat with a knife is evidence of the intent to inflict serious bodily injury. *See Adams v. State*, No. 05-05-01682-CR, 2007 WL 39001, at *3 (Tex. App.—Dallas Jan. 8, 2007, no pet.) (not designated for publication).

Although a knife is not a deadly weapon per se, "the court of criminal appeals has held that an object, such as a knife, can be a deadly weapon if the actor intends to use the object in a way in which it would be capable of causing

8

death or serious bodily injury." *Wingfield*, 282 S.W.3d at 107; *see McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000); *Thomas v. State*, 821 S.W.2d 616, 618–19 (Tex. Crim. App. 1991); *Russell v. State*, 804 S.W.2d 287, 290 (Tex. App.—Fort Worth 1991, no pet.). In determining the deadliness of the knife, the factfinder may consider the knife's size, shape, sharpness; the manner of its use and intended use; its capacity to produce death or serious bodily injury; the threats or words used by the defendant; and the proximity of the assailant. *See Wingfield*, 282 S.W.3d at 107; *Russell*, 804 S.W.2d at 290.

Expert testimony is not required to show the deadliness of a knife. *Russell*, 804 S.W.2d at 290 (holding that testimony from an eyewitness that the defendant held a knife having a foot-long blade at the victim's back was sufficient to show that it was a deadly weapon). The presence and severity of wounds on the victim are factors to be considered in determining whether an object was used as a deadly weapon. *Gordon*, 173 S.W.3d at 873. But wounds are not required before a knife can be determined as a deadly weapon, and the knife does not have to be introduced into evidence before it is found to be a deadly weapon. *See Brown v. State*, 716 S.W.2d 939, 946 (Tex. Crim. App. 1986); *Gorham v. State*, 985 S.W.2d 694, 697 (Tex. App.—Fort Worth 1999, pet. ref'd) (holding that a knife that had been used in a threat and had

9

been described but not introduced at trial was a deadly weapon when an officer testified that it was capable of causing death or serious bodily injury).

In *McCain*, the defendant had kicked in the door of the victim's kitchen and hit her several times with his fist when she saw that he had a long, dark object in his back pocket that she believed to be a knife. *McCain*, 22 S.W.3d at 499. The defendant did not ever touch or refer to the knife in any way. *Id.* When the defendant was arrested, the police found a butcher knife with a nine-inch blade. *Id.* The court of criminal appeals held that the butcher knife was a deadly weapon because it was used to threaten deadly force, even if the defendant had no intention of actually using deadly force. *Id.* at 503. The court explained, "[T]he mere carrying of a butcher knife during such a violent attack as occurred in the present case was legally sufficient for a factfinder to conclude that the 'intended use' for the knife was that it be capable of causing death or serious bodily injury." *Id.*

Here, Officer Cox testified that based upon his training and experience, a large knife is capable of causing death or serious bodily injury, particularly when the knife is held close to someone's throat. Oliver testified that Denson could have caused death or serious bodily injury to Conyers when he moved his knife close to her throat. Stiefer testified that Denson "reached back behind [Conyers's] head, grabbed her by the hair of the head, straddled her and started

10

to cut her throat." Conyers testified that if Oliver had not been present during her altercation with Denson, she is "pretty sure [Denson] would have stabbed [her]." The evidence shows that Denson had already pushed Conyers into the street, kicked her, and stomped her.

The knife was about a foot long according to Oliver, and it was obviously sharp enough to cut skin because it cut Conyers's hand when, as Oliver testified, Denson tried to cut Conyers's fingers off, which shows his intent to cause serious bodily injury. *See Allen*, 736 S.W.2d at 226–27. The cut was deep enough that it caused Conyers's blood to spill all through Oliver's truck. Conyers said about Denson's attack, "I [saw] my life flash before me. I was scared." She also said that her hand was throbbing in pain. Viewing this evidence in the light most favorable to the prosecution, we hold that it is legally sufficient to show that the butcher knife was, in its use and intended use, capable of causing death or serious bodily injury; thus, the knife qualifies as a deadly weapon. *See* Tex. Penal Code Ann. § 1.07(a)(17)(B), (46). We overrule Denson's first point.

As to factual sufficiency, although Denson testified that he did not hold the knife toward Conyers's throat and Conyers also did not testify about that

fact,[6] Oliver and Stiefer did testify about Denson's act in that regard, and we must defer to the trial court's implicit resolution of conflicting evidence in a factual sufficiency review. *See Johnson*, 23 S.W.3d at 8–9. For the same reason, we cannot overturn Denson's conviction based on his other testimony and his assertion of self-defense during his altercation with Conyers, which conflicted with the testimony of the other three eyewitnesses. *See id.* We hold that the evidence detailed above, viewed in a neutral light, is factually sufficient to show that the butcher knife that Denson used was a deadly weapon, and we overrule his second point. *See Steadman*, 280 S.W.3d at 246–47; *Watson*, 204 S.W.3d at 414.

---

[6] Conyers said in response to a question about whether she grabbed the knife to try to keep Denson from cutting her, "It happened so fast, I just don't remember."

Conclusion

Having overruled both of Denson's points, we affirm the trial court's judgment.


                                        TERRIE LIVINGSTON
                                        JUSTICE

PANEL:  CAYCE, C.J.; LIVINGSTON and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  December 10, 2009